UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOE F. BROWN,

Plaintiff,

-against-

ORANGE AND ROCKLAND UTILITIES, INC.

Defendant.

DEFENDANT'S
RULE 56.1
STATEMENT

05 CIV 4896 (SCR)

Pursuant to Rule 56.1 of the Federal Rules of Civil Procedure, Orange and Rockland Utilities, Inc. ("O&R," "Defendant," or the "Company") hereby submits in support of Defendant's Motion for Summary Judgment the following statement of material facts as to which Defendant contends there is no genuine issue to be tried:

1.  Throughout his employment at O&R, Plaintiff worked in union job titles (Pl. Tr. 15).

2.  The terms and conditions of Plaintiff's employment were governed by the collective bargaining agreement between O&R and Local Union 503 of the International Brotherhood of Electrical Workers ("IBEW" or "Union") (Pl. Tr. 15).

3.  O&R, a wholly owned subsidiary of Consolidated Edison, Inc., is an electric and gas utility headquartered in Pearl River, New York (Evans Decl. ¶2).

4.  In May 1986, Plaintiff took a Company truck loaded with plywood off Company property without authorization, and abandoned the truck on the side of a public road (Pl. Tr. 111-12, 114, 116).

5.    Plaintiff did not report the aforementioned truck incident to anyone until after the abandoned vehicle was noticed by the police and they notified the Company (Pl. Tr. 111-12, 114, 116).

6.    Plaintiff received a five-day suspension in connection with the afore-mentioned truck incident (Evans Decl. ¶ 26).

7.    Company documents show that Plaintiff has a history of poor work performance on the job (Evans Decl. ¶¶26-33).

8.    In 1993, during Farley's investigation of Ray Hoffman's claims of alleged harassment based on race by Charles Preda against Plaintiff, Plaintiff stated to Farley that Preda's actions were neither discriminatory nor predicated on race (Farley Tr. 10, 79).

9.    In 1993, Plaintiff grabbed his supervisor Charles Preda by the throat, and began to choke him (Pl. Tr. 205).

10.   In April 1997, after setting a piece of Company equipment on fire, Plaintiff was transferred, demoted in title to Laborer and placed on an All Inclusive Final Warning (Pl. Tr. 10-11, 15-16; Evans Decl. ¶30).

11.   In May 1997, pursuant to a Company-Union agreement, Plaintiff was conditionally awarded the union position of Gas Fitter, 3rd Class (Evans Decl. ¶31).

12.   In 1997, Plaintiff told one of his supervisors that he was suffering from a chemical imbalance that caused him to be confused (Evans Decl. ¶33).

13.   In January 1998, unable to perform the duties of Gas Fitter, 3rd Class, Plaintiff was returned to his prior title of Laborer (Evans Decl. ¶32).

14. In April 1998, Plaintiff successfully bid for the position of Stockhandler in the Spring Valley Stores Department (Pl. Tr. 12-16; Evans Decl. ¶ 34),

15. Spring Valley Stores Department is the largest of O&R's five Stores facilities with approximately eight employees, including two managers, during the relevant time period (Pl. Tr. 194, 203; Pfeil Tr. 45-46).

16. Plaintiff's duties as a Stockhandler included loading, unloading, handling delivery of materials, and keeping inventory of stock items (Pl. Tr. 13; Huber Tr. 13).

17. Up to 1999, Plaintiff and Garland Latta were the two black employees working in Stores (Pl. Tr. 20-21; Huber Tr. 10-12).

18. O&R has black employees working at other locations and in other capacities (Pl. Tr. 22).

19. In 2002, Plaintiff was promoted to Assistant Storekeeper in the Spring Valley Stores Department (Pl. Tr. 14; Huber Tr. 13-14).

20. Plaintiff remained Assistant Storekeeper in the Spring Valley Stores Department until he retired on April 1, 2005 (Pl. Tr. 9, 13; Compl. ¶ 4).

21. Other than a landscaping business that he operates during the summers, Plaintiff is unemployed and has not sought employment (Pl. Tr. 7-8).

22. Between 1998 and 1999, Kevin Pfeil and Plaintiff worked as Stockhandlers in the Spring Valley Stores Department (Pfeil Tr. 9, 15).

23. Plaintiff did not like Pfeil's telling him what to do (Pl. Tr. 24-25).

24.   In December 1999, Pfeil was promoted to the position of Assistant
      Storekeeper and moved to the West Nyack Stores location (Pfeil Tr. 15;
      Pl. Tr. 25).

25.   In March 2003, Pfeil was promoted to Storekeeper and returned to the
      Spring Valley Stores location (Pfeil Tr. 19; Pl. Tr. 25-26).

26.   Pfeil, in addition to his Storekeeper responsibilities, performed the duties
      of a Stockhandler (Pfeil Tr. 24; Pl. Tr. 208-09).

27.   Plaintiff, in addition to his Assistant Storekeeper responsibilities,
      performed the duties of a Stockhandler (Pfeil Tr. 24; Pl. Tr. 208-09).

28.   Plaintiff's responsibility as Assistant Storekeeper included filling in for
      Pfeil in his absence (Pl. Tr. 26; Huber Tr. 13-14).

29.   Plaintiff's immediate supervisor was Stores Supervisor Robert Huber
      (Pfeil Tr. 6; Huber Tr. 13-15).

30.   Huber did not inform the Stores Department employees every single time
      an item was missing from Stores or there was a discrepancy in the
      inventory count (Huber Tr. 55-56).

31.   At his deposition, Plaintiff stated that he felt he was "kept out of the loop"
      because the supervisor before Huber had informed the employees
      regularly about missing items (Pl. Tr. 98-101).

32.   Plaintiff concluded that whenever materials were deemed missing from
      the Spring Valley Stores Department, Pfeil was accusing him of stealing
      them (Compl. ¶ 7).

33. Items that Plaintiff claims he was accused of stealing, ultimately, were found to have either been misplaced and subsequently located in other parts of the Company or the Stores warehouse, or to have been slated for disposal (Pl. Tr. 45-46).

34. Plaintiff does not have any admissible evidence that Pfeil was accusing him of stealing items from the Stores Department.

35. At his deposition Plaintiff testified that he did not hear the substance or content of an alleged conversation he describes occurred between Pfeil and another union co-worker, Tom Bramich (Pl. Tr. 35-37, 41).

36. Plaintiff concluded that Pfeil was making anonymous calls to his home and hanging up (Pfeil Tr. 20-22, Pl. Tr. 56-58).

37. Plaintiff has no physical evidence that Pfeil was making anonymous calls to his home (Pl. Tr. 57)

38. Huber was unable to substantiate Plaintiff's allegations of accusations of theft being made against him (Huber Tr. 21-23, 40).

39. When Huber specifically asked Plaintiff whether he believed the alleged accusations made against him were race-based, Plaintiff responded, "No." (Huber Tr. 66-67).

40. Plaintiff declined Huber's initial recommendation that Plaintiff's concerns be referred to the Human Resources Department to conduct a formal investigation into the rumors he claims were being spread by Pfeil (Huber Tr. 29-30).

5

41.   Instead, Plaintiff said he would resolve it through the Union (Huber Tr. 29-30).

42.   Plaintiff conjured up a false story to get co-worker Ed Pelton to his home and show him that he did not have any stolen Company materials (Pl. Tr. 85-86).

43.   Plaintiff also brought his supervisor, Morris, to his home to prove that he did not have any stolen Company property (Pl. Tr. 86-87).

44.   At no time, however, did anyone at O&R ever ask to inspect Plaintiff's home or his personal belongings (Pl. Tr. 88).

45.   In or about April 2003, Plaintiff requested a meeting with Union Business Representative James Humphrey and the Spring Valley Stores Department union workforce, including Pfeil, to discuss his allegations of theft accusations, rumors, and phone calls to his home (Pl. Tr. 54-55, 63; Compl. ¶ 10; Pfeil Tr. 34-35).

46.   Humphrey was unable to substantiate any of Plaintiff's claims (Pl. Tr. 61).

47.   After the March 2003 meeting with Humphrey and Plaintiff's co-workers, the alleged anonymous calls to Plaintiff's home stopped (Pl. Tr. 57-58).

48.   At Plaintiff's request, Elaine Farley from O&R Human Resources Department, met with Plaintiff to investigate his allegations about accusations and rumors of his stealing materials, anonymous phone calls to his home, and claims that co-workers did not want to work with him (Farley Tr. 18, 22; Pl. Tr. 64).

49.    Between March 2003 and April 1, 2005, Plaintiff socialized with his co-workers, including sailing and engaging in after work activities (Pfeil Tr. 53).

50.    At no time during any of Plaintiff's meetings with Farley, between 2003 and 2004, did Plaintiff claim that the alleged accusations being made against him were based on race (Farley Tr. 79-80, 86-87).

51.    Farley was unable to substantiate any of Plaintiff's claims (Farley Tr. 38-39, 42; Pfeil Tr. 35-36).

52.    Vice President Carol Monti Barris met with Plaintiff, in or about February 2004, and he told her about his belief that he was being accused of stealing materials and the alleged anonymous "hang-up" calls to his home (Pl. Tr. 67-68; Farley Tr. 44-45; Compl. ¶14).

53.    Plaintiff did not claim to Carol Monti Barris that the alleged accusations being made against him between 2003 and 2004 were based on race.

54.    There is no record of any allegations of theft having been made against Plaintiff (Farley Tr. 37-39).

55.    Plaintiff, for the first time, observed what he perceived to be a "noose," when he first arrived to the Spring Valley Stores Department in 1998, draped overhead on the ceiling rafters (Pl. Tr. 116-117).

56.    This alleged noose remained on the ceiling rafters until 2004 or 2005 and Plaintiff admits that he did not object to the appearance or existence of this rope because it was there prior to his arrival at Spring Valley Stores Department (Pl. Tr. 117, 120-21).

57.   Plaintiff admits that neither the appearance nor existence of this rope over the ceiling rafters bothered him (Pl. Tr. 120-21).

58.   Ropes with loops of this kind are frequently used as pulleys to move or lift heavy items in the Stores Department (Evans Decl. ¶35)

59.   Plaintiff admits that the storeroom stocked rope and it was a supply that was used frequently for various purposes (Pl. Tr. 123).

60.   Sometime between July 2004 and January 2005, Plaintiff noticed two other, recently placed, ropes that appeared to him to be nooses (Pl. Tr. 117, 179).

61.   In these two separate instances, he reported the ropes to Pfeil who immediately removed them (Pl. Tr. 117, 179).

62.   In addition, without Plaintiff's having to request it, Pfeil also removed the rope that had originally been hanging from the rafters (Pl. Tr. 117).

63.   Plaintiff speculates that Bonne had placed the nooses around the work area (Pl. Tr. 119).

64.   Plaintiff had an opportunity to transfer laterally out of Spring Valley Stores and move to the Stores Department's Middletown location (much closer to his home) but he refused (Pl. Tr. 99-100).

65.   In 2004, a co-worker in the Stores Department was involved in a murder-suicide (Evans Aff. ¶21).

66.   Plaintiff complained that he was being followed and watched by O&R employees after work (Evans Decl. Exh.C).

8

67. On March 1, 2004, representatives from management and the Union held a meeting in the Spring Valley Operations Center with Plaintiff (Evans Decl. ¶9; Pl Tr. 70-71; Compl. ¶16).

68. During the meeting Plaintiff yelled at individuals in the room (Evans Decl. ¶10; Pl. Tr. 72; Huber Tr. 38).

69. During the meeting Tom Evans, Director of Labor Relations, and Bob Citrolo, Union President stepped out of the room (Evans Decl. ¶¶10-11).

70. The meeting was ended and Plaintiff was placed on immediate sick leave (Evans Decl. ¶11; Pl. Tr. 72; Compl. ¶17).

71. While out on sick leave, Plaintiff met with Dr. Alan Tuckman, a psychiatrist (Evans Decl. ¶12; Pl. Tr. 74).

72. Dr. Tuckman's report includes admissions by Plaintiff that he was "paranoid" and that he continued raising the issue of stealing in anticipation that someone would actually accuse him of it (Evans Decl. ¶ 12).

73. In his report, Dr. Tuckman concluded that Plaintiff was suffering from "Depressive Disorder with Paranoid Features, possibly precipitated by a host of medical problems over the last several years" (Evans Decl. ¶12)

74. Dr. Tuckman recommended that Plaintiff receive psychotherapy and remain out of work.  (Evans Decl. ¶12)

75. Plaintiff was referred to the Company's Employee Assistance Program ("EAP") and placed in an outpatient program for therapeutic counseling (Evans Decl. ¶¶5, 13; Pl. Tr. 77).

76.     After Plaintiff had been in the outpatient program for approximately ten
        weeks, the program's staff recommended that he could return to work
        (Compl. ¶ 20; Pl. Tr. 73).

77.     Plaintiff returned from sick leave on or around May 17, 2004, but soon
        thereafter he began to complain again that he was being accused of
        stealing (Huber Tr. 48-49).

78.     Plaintiff was able to communicate with his counselors, as needed, during
        work hours (Evans Decl. ¶14).

79.     Plaintiff, on his own accord, scheduled a lie detector test, on or about
        October 22, 2004, to be administered by the NYS Police Department, and
        informed O&R personnel that they were invited to attend and to submit
        questions in order to dispel the rumors that he believed were being spread
        (Evans Decl. ¶15).

80.     Plaintiff claimed that people from O&R were allegedly following him
        when he left work (Evans Decl. Exh.C).

81.     Plaintiff claimed that, on or about August 21, 2004, a car from O&R
        followed him to a restaurant and then turned away when Plaintiff parked
        his car (Evans Decl.¶17).

82.     Plaintiff self-registered with an agency called the Bureau of Criminal
        Investigation ("BCI") in order to prove that he was not stealing (Evans
        Decl. ¶17).

83.  On or about January 26, 2005, Plaintiff claims, he had seen his co-worker, Keith Bonne, removing a box from the storeroom, and had reported it to Pfeil (Pl. Tr. 131, 191).

84.  Plaintiff did not know what was in the box or for what purpose Bonne was removing it (Pl. Tr. 137).

85.  Bonne was subordinate in title to Plaintiff (Pl. Tr. 26; Huber Tr. 13-14).

86.  Plaintiff reported his observation to Pfeil because, he said, he did not want to be accused of stealing the box if it turned up missing (Pl. Tr. 132, 191).

87.  On January 27, 2005, during the Stores Department's regularly scheduled monthly staff meeting, Plaintiff claims he brought up his question about Bonne's removing the box the day before (Pl. Tr. 196; Compl. ¶ 24).

88.  Huber and Morris refused to discuss this matter during the meeting (Pl. Tr. 133, 194; Huber Tr. 55; Compl. ¶ 25).

89.  After the meeting, Plaintiff followed Huber to his office, and yelled and cursed at him (Huber Tr. 56, 68; Pl. Tr. 198).

90.  Plaintiff yelled words to the effect that he was going to have his day (Huber Tr. 56, 68; Pl. Tr. 198).

91.  Plaintiff stated that if he had been accused of removing an item, the Company "would have the National Guard at the front gate to strip search me" (Pl. Tr. 134).

92.  In December 2004, Plaintiff submitted a written request to retire from O&R on April 1, 2005 (Pl. Tr. 141, 201-202; Evans Decl. ¶18)

93.  Plaintiff turned age 60 in February 2005 (Evans Decl. ¶19).

11

94.     Plaintiff is collecting an $800 retirement supplement for two years from
        O&R for retiring at age 60 (Evans Decl. ¶25).

95.     In lieu of suspension for his actions on January 27, 2005, the Company
        offered Plaintiff the opportunity to utilize his remaining vacation time and
        to bridge (i.e., pay) Plaintiff for the remaining six days until his April 1,
        2005, retirement date (Evans Decl. ¶¶19, 22).

96.     Union Business Representative Humphrey conveyed this offer to Plaintiff
        on January 28, 2005, and Plaintiff rejected it (Huber Tr. 57; Pl. Tr. 135;
        Compl. ¶ 28).

97.     In the absence of an agreement, Evans proceeded with his prior decision to
        suspend Plaintiff, and suspended Plaintiff effective January 28, 2005,
        (Evans Decl. ¶ 23; Pl. Tr. 165; Compl. ¶ 29).

98.     On January 31, 2005, the Union filed a grievance in connection with
        Plaintiff's suspension (Evans Decl. ¶24).

99.     As a result, the Union and the Company entered into discussions to
        attempt to resolve the grievance, and the parties agreed that the Company
        would pay Plaintiff sick time for the period from February 2, 2005,
        through March 31, 2005 (41 days) with time not worked on January 28,
        January 31 and February 1, 2005 (a total of 18.5 hours) as suspended time
        served without pay; and that in return, Plaintiff would sign an irrevocable
        letter of retirement affirming the April 1, 2005, resignation date and
        stating his intent to not return or seek future employment at O&R, its

parent corporation (Con Edison) or any other subsidiaries and affiliates of O&R.  (Evans Decl. ¶ 24).

100.    Plaintiff then retired effective April 1, 2005 and is collecting his full pension and the $800 supplement (Evans Decl.  ¶25)


Dated: New York, New York
       June 2, 2006

MARY SCHUETTE (MS 4752)
Attorney for Defendant
Consolidated Edison Company of
 New York, Inc.
4 Irving Place, Room 1815-S
New York, NY 10003

OF COUNSEL:
Eva L. Martinez (EM 9405)
(212) 460-6671
Barbara J. Carey (BC 6895)
(212) 460-1122


TO:    Michael H. Sussman
       Attorney for Plaintiff
       P.O. Box 1005, 40 Park Place
       Goshen, New York 10924

13

## PROOF OF SERVICE

STATE OF NEW YORK          )
                           )          ss.:
COUNTY OF NEW YORK         )


        I, Patricia A. King, being sworn, say I am not a party to the action, am over 18 years of age and my place of business address is 4 Irving Place, Room 1800, New York, New York 10003.

        On July 2, 2006 I mailed the following document(s):

        *Defendant's Notice of Motion for Summary Judgment*
        *Defendant's Motion for Summary Judgment*
        *Defendant's Rule 56.1 Statement of Undisputed Facts*
        *Declaration of Eva L. Martinez and exhibits in support of*
        *Defendant's Motion for Summary Judgment*
        *Declaration of Thomas L. Evans and exhibits in support*
        *of Defendant's Motion for Summary Judgment*

        ☒       by depositing a true copy thereof enclosed in a postpaid envelope, in an official depository under the exclusive care and custody of the United States Postal Service addressed to the following person(s):

To:     Michael Sussman
        Attorney for the Plaintiff
        P.O. Box 1005
        40 Park Place
        Goshen, NY 10924


                                        _Patricia A. King_
                                        Patricia A. King


Sworn to before me this
2nd day of June 2006

_Maria Dalton_

256351

                        MARIA DALTON
                Notary Public, State of New York
                        No. 01DA5010017
                    Qualified in Nassau County
                Commission Expires March 22, 2007